STATE OF VERMONT

SUPERIOR COURT                              ENVIRONMENTAL DIVISION

}
In re Woodstock Community Trust          }
 and Housing Vermont PRD                 }          Docket No. 203-10-09 Vtec
      (Appeal of Roy, et al.)             }
                                          }


                                          }
In re Woodstock Community Trust          }
and Housing Vermont Act 250 Application  }          Docket No. 15-1-10 Vtec
      (Appeal of Roy, et al.)             }
                                          }

Decision and Order

In Docket No. 203-10-09 Vtec, Appellants David and Mary Roy, Michael and Tonia Hirschbuhl, Richard and Roberta Roy, Glenn and Charlotte Barr, Richard and Shirley Burroughs, and Jay Smith appealed from a decision of the Development Review Board (DRB) of the Town of Woodstock issued on October 5, 2009, granting final approval to a Planned Residential Development (PRD) located at 473 Woodstock Road and now known generally as the "Grange Hill" project, proposed by Appellee-Applicants Woodstock Community Trust, Inc. and Housing Vermont.[1] In its Statement of Questions, the municipal appeal raised two preliminary issues and thirty-two numbered questions, some having several sub-parts, on the merits of whether the application meets the requirements for planned residential

---

[1] This Court had issued a decision in 2008 on a prior application for a PRD on the project property, determining that some aspects of the prior proposal met the standards of the municipal ordinance, and that other aspects of the prior proposal failed to meet those standards. In re Woodstock Community Trust and Housing Vermont PRD, Nos. 126-6-07 Vtec and 263-11-06 Vtec (Vt. Envtl. Ct. Oct. 15, 2008) (Wright, J.) (the 2008 Decision).

1

development, conditional use approval, and site plan approval, including issues in specific subsections of §§ 313, 403, 523, 612, 709, and 710 of the Zoning Regulations.[2] The municipal appeal was placed on inactive status while the District 3 Environmental Commission concluded its consideration of the same project.

In Docket No. 15-1-10 Vtec, Appellants David and Mary Roy, Michael and Tonia Hirschbuhl, Richard and Roberta Roy, Glenn and Charlotte Barr, Richard and Shirley Burroughs, Tod and Jen Menotti, Kedrick and Kathy Harriman, and Jay Smith appealed from a decision of the District 3 Environmental Commission granting an Act 250 Land Use Permit for the proposed project. The Act 250 appeal also raised two preliminary issues, as well as raising issues as to whether the project meets Act 250 Criteria 1(B) (Waste Disposal related to Stormwater), 1(D) (Floodways), 1(E) (Streams), 1(G) (Wetlands), 3 (Existing Water Supply), 4 (Erosion), 5 (Traffic Safety and Congestion), and 8 (Aesthetics). 10 V.S.A. § 6086(a). For ease of reference and to distinguish the questions in the Act 250 appeal from those in the municipal appeal, this decision will refer to the Act 250 issues by their criterion numbers rather than by a question number.

---

[2]  For ease of reference, this decision will refer to the thirty-two numbered questions in Part III of the Statement of Questions in the municipal appeal by their respective numbers and without including a Part III prefix. All references to section numbers are to the Zoning Regulations unless otherwise noted. Municipal Questions 1 through 22 address the Planned Development standards of § 313 of the Zoning Regulations. Municipal Questions 23 through 25 address § 403 protections of wetlands and stream banks. Municipal Questions 24, 26, and 27 address the riparian buffers and setbacks required by § 523. Municipal Questions 28 and 29 address the access road requirements of § 612. Municipal Question 30 addresses six of the seven requirements for site plan approval found in § 709(B). Municipal Question 31 addresses seven of the thirteen requirements for conditional use approval found in § 710(A). Municipal Questions 21 and 32 ask whether any additional conditions are necessary in granting planned development approval or conditional use approval, respectively.

Appellants in both appeals (Appellants) are represented by Kaveh S. Shahi, Esq., and Appellee-Applicants in both appeals (Applicants) are represented by Daniel C. Hershenson, Esq.[3]  In Docket No. 203-10-09 Vtec, the Town of Woodstock is represented by Todd C. Steadman, Esq. but did not take an active role at trial or in the briefing of the merits of these appeals.  In Docket No. 15-1-10 Vtec, the Land Use Panel of the Natural Resources Board and the Vermont Agency of Natural Resources had informational status only and did not participate in the appeals.

In the municipal appeal, Docket No. 203-10-09 Vtec, the Court resolved Question I of the Statement of Questions by summary judgment, concluding that it was not an impermissible successive appeal, that is, that the application had been redesigned or changed to address the concerns that had prevented approval of the prior application.  In the Act 250 appeal, Docket No. 15-1-10 Vtec, the Court dismissed Question 1 of the Statement of Questions as calling for an improper advisory opinion.  The Court also denied Appellants' request, stated as the second question in the Statement of Questions in each appeal, to stay the appeals pending the final outcome of their property rights dispute.

After resolution of the preliminary issues by motion, an evidentiary hearing was held on the merits of these appeals over the course of five days before Merideth

---

[3]  The principal parties are also involved in litigation of several private property issues in the Civil Division of the Superior Court, Windsor Unit, <u>Roy, et al. v. Woodstock Community Trust</u>, No. 678-10-07 Wrcv, in which some claims were resolved favorably to Defendant by motion, but in which the Court issued a judgment order on July 20, 2011 in favor of Appellant Jay Smith, based on a jury verdict, declaring that "the location of the defendant's proposed development on the Grange Hall lot unreasonably interferes with the plaintiff Jay Smith's spring rights." This litigation has been appealed to the Vermont Supreme Court and has been assigned Docket No. 2011-265, but has been remanded for the trial court to consider motions to alter and amend, and to clarify, now scheduled for an additional evidentiary hearing in the Civil Division on November 23, 2011.

Wright, Environmental Judge. In addition, the parties requested that the Court consider the evidence taken over the course of the six-day trial of Docket Nos. 126-6-07 Vtec and 263-11-06 Vtec, as well as the site visit of the property and the surrounding area of West Woodstock taken with the parties and their representatives in connection with those earlier appeals. The parties were given the opportunity to submit written memoranda and requests for findings. Upon consideration of the evidence as illustrated by the site visit, and of the written memoranda and requests for findings filed by the parties, the Court finds and concludes as follows.

The Parties and the Proposed Project

The proposed Grange Hill project is an affordable housing[4] development of 36 dwelling units proposed for the hamlet of West Woodstock, in a Residential Medium Density zoning district of the Town of Woodstock, in an area served by a municipal sewer system and by a municipal or community water system operated by the Woodstock Aqueduct Company. Applicants are two non-profit entities, each organized for the purpose of increasing the availability of affordable housing.

Applicant Housing Vermont is a statewide non-profit corporation in existence since 1988, whose purpose is to increase the stock of affordable housing units throughout Vermont by developing and owning affordable rental housing. It has developed more than 4,200 rental dwelling units, affordable to low and moderate income residents, in 142 projects throughout Vermont. It proposes to develop the Grange Hill project as the tax and finance general partner of a housing limited partnership; its local managing general partner for this project will be the

---

[4] The project falls within the definitions of affordable housing found at § 109 of the Town of Woodstock Zoning Regulations and at 24 V.S.A. §§ 4303(1), (2).

4

Twin Pines Housing Trust, a non-profit affordable housing developer in the Upper Valley region of Vermont, with approximately twenty years of experience in developing and managing affordable housing units. Applicant Woodstock Community Trust is a non-profit organization organized for the purpose of providing affordable housing in the Town of Woodstock; it owns the project property on both sides of Route 4.

The project is proposed for an 8.02-acre parcel of land on the northerly side of Route 4,[5] consisting of two tax parcels that have merged for the purposes of this application: a half-acre parcel containing a former Grange building, with 70 feet of frontage on Route 4, and a 7½-acre vacant parcel of land, with 22.88 feet of frontage at the Route 4 end of the proposed access roadway. The former Grange parcel and the 4.07-acre portion of the project property proposed for development with housing units and associated infrastructure constitute the Development Area of the project property, shown as outlined in red on Applicants' Ex. E. Most of the Development Area is located behind (northerly of) the properties of Appellants Hirschbuhl, David and Mary Roy, Barr, and diagonally behind the property of Appellant Smith. All four of these Appellants' parcels have frontage and access directly onto Route 4. Appellants Burroughs' property is located adjacent to the northerly boundary of the 8-acre project property; the Burroughs water line traverses the project property to connect to the water main in the Route 4 right-of-way. Appellants Robert and Roberta Roy's property is located adjacent to the westerly boundary of the project property; the Roy water line traverses the project property westerly of the Grange building to connect to the water main in the Route 4 right-of-way.

In addition to the 8-acre project property on the northerly side of Route 4, a

---

[5] Although Route 4 actually runs from the northeast to the southwest in this location, for simplicity of reference this decision will refer to the directions as if Route 4 ran directly in an east-west direction.

stormwater detention pond and piping comprising the proposed stormwater discharge system for the project are proposed to be located on a one-acre parcel of land on the southerly side of Route 4, known as the former Fox parcel.

Twenty-eight of the proposed dwelling units are proposed to remain as rental units to be rented at an affordable rate, while the remaining 8 dwelling units are proposed to be sold to private owners. The project is designed as a common interest community. Unit 1, to be owned by the housing limited partnership, will consist of all of the land, common land, roads and other infrastructure, including the Fox parcel, and the rental units; Units 2 through 9 will consist of the eight sale units and will have a license to use all of the common area.

The 4-acre portion of the 8-acre project parcel proposed for the new residential development consists largely of a relatively flat field that was formerly used as a community playing field with associated gravel parking areas. Beyond the four-acre Development Area, the remainder of the project property is proposed to be maintained as private open space for the use of the project residents.[6] The parcel slopes beyond the field steeply upward towards the north and west. Much of the steeply sloping hillside is wooded, as shown in dark green on Applicants' Ex. E. The central portion, shown in light green, is grass.

Absent any alteration of the natural drainage due to the project, the natural drainage over the property is generally from its far northwestern corner towards the south and east. Runoff that does not infiltrate into the relatively porous soils on the lower portion of the property drains to the Ottauquechee River by several routes. Only a small portion of the drainage from the property crosses Route 4 through a culvert near the Grange building and reaches the Ottauquechee by way of the Fox

---

[6] Although a representative of Applicants stated at trial that the project would be "neighborly" about allowing the other hamlet residents to use the open space, such permission is not explicit in the application documents.

parcel and Vondell Brook. Most of the drainage from the upland portion of the property travels southeasterly across the Vytra and Smith properties and reaches the Ottauquechee by way of Prosper Brook or by overland flow from Route 4. As more fully described in the discussion of stormwater below, Vondell Brook drainage reaches the Ottauquechee either by passing through culverts near the properties of Appellants Menotti and Harriman, or via a bypass swale above the Menotti property that conducts water southerly across the Woodstock Union High School property to the Ottauquechee River. Applicants have obtained a stormwater easement over the High School property for project stormwater.

The two-way access road for the project extends from Route 4 into the Development Area, passing between the Hirschbuhl property and the David and Mary Roy property. The entrance to the Woodstock middle school and high school complex, which also includes a community facility known as the Union Arena, is located about 550 feet farther to the west along Route 4 from the project access road, on the opposite side of Route 4.

The project roadway forms a square or loop roadway within the property with an extension towards the Grange building, ending in a parking lot northerly of building 9B. Another parking lot is located on the easterly side of the loop road between buildings 3A and 2C. Additional parking spaces are provided on the streets, and in the driveways and garages associated with the residential buildings. A total of 80 parking spaces are provided: 38 in the driveways, 23 in the parking lots, 15 along the streets, and 4 in building garages.

Unlike the loop roadway disapproved in the 2008 Decision, the interior roadway is not located adjacent to Appellants' back yards. Instead, Appellants' back yards are insulated from the project roadway by four of the project buildings and those buildings' associated back yards, and, in Appellant Hirschbuhls' case, by a plot of community gardens as well as by new fencing. Landscaping with

7

evergreen species (fir, spruce, and arborvitae) is proposed on the project property adjacent to the Barr and the David Roy back yards.

Applicants propose to construct fourteen new residential duplex or triplex buildings on approximately four acres of the vacant parcel (the Development Area), facing onto the interior loop streets and clustered around a small central open green space area. In addition, a small playground area is located in the northwest corner of the proposed development, farthest from Route 4 and Appellants' houses. All of the new buildings are designed to reflect elements of traditional Vermont vernacular architecture, with pitched roofs, dormers, porches, double-hung widows, clapboard siding, corner boards and window trim. They are relatively small in scale, appearing as 1½ to 2½ story residential buildings, some with the appearance of an addition, and are compatible in style and appearance to the existing residential buildings in the neighborhood along Route 4.

Ten of the new buildings are duplex buildings, in four different duplex building designs. Duplex designs A and B each contain two 2-bedroom units, each duplex design E contains two 3-bedroom units, and each duplex design F contains one 2-bedroom unit and one 3-bedroom unit. The duplex design E and F buildings are proposed as the units for sale. The other four new buildings are triplex buildings, in two different triplex building designs. Each triplex design C contains three 1-bedroom units; the ground floor unit is wheelchair accessible. Each triplex design D contains one wheelchair-accessible 2-bedroom unit on the ground floor and a 1-bedroom unit on each of the two upper floors.

Applicants propose to construct four dwelling units in the existing Grange building, consisting of two 3-bedroom units and two 2-bedroom units. They propose to restore the building to closer to its original 1914 appearance, having a front porch with columns, and to install in it a laundry facility with four washers and four dryers to serve the 28 affordable rental units proposed for the project as a whole.

The remaining eight units, which are proposed to be sold, each contain their own washer and dryer facilities.

The project will have a total of 70 bedrooms in 36 units, including those in the new buildings and the Grange building. Based on the estimated occupancy rate for similar affordable housing projects in Vermont, experienced by Housing Vermont over all its projects, the 70 bedrooms proposed by this project will generate a population of approximately 75 individuals. Approximately eight of the individuals are expected to be school-aged children, of whom approximately three can be expected to be in grades 7 through 12 and would be expected to walk to the middle-and-high school complex across Route 4 from the project property.

A drainage swale is designed to intercept stormwater coming from the northwesterly portion of the upland project property to conduct it around the Development Area. As redesigned, the site work necessary to install and maintain the drainage swale will only require cutting of trees in a small portion of the forested area, will disturb less of the slope and will not require the elaborate retaining wall system of the prior design discussed in the 2008 Decision. Rather, the drainage swale will be covered with gravel and will function as a pedestrian path or trail to the upland open space area of the project parcel. As approved in the ANR stormwater permit, the upland drainage is now designed to be conducted under Route 4 and across the Fox parcel in pipes and to discharge directly by pipe into Vondell Brook, a tributary of the Ottauquechee River.

Applicants have obtained a final state stormwater discharge permit #5685-9015 from the Vermont Agency of Natural Resources (ANR), approving coverage of the stormwater system under General Permit 3-9015, and authorizing the project to discharge stormwater to Vondell Brook, a tributary of the Ottauquechee River. Applicants have also obtained a final state stormwater construction permit # 5685-9020 from the ANR approving the project's stormwater management and erosion

9

control and authorizing the discharge of stormwater during the project's construction, under General Permit 3-9020. In addition, Applicants have obtained approval from the U.S. Army Corps of Engineers (permit # NAE-2008-978) for work in the Class III wetland on the Fox parcel during the construction of the stormwater detention pond and its piping.

Adequacy of Application

Municipal Question 18

Section 313(C)(3) requires an applicant for planned development approval to submit a sketch plan showing the elements listed in subsections (c) through (j), which include, in subsection (d), "all existing rights-of-way and easements, whether public or private." Applicants have submitted an application, consisting of a set of plans and drawings, and a project narrative, that is more than adequate to show all but one of the elements required by § 313(C)(3). Appellants argue only that the application fails to refer to or recognize the spring rights asserted by Appellant Jay Smith. Those spring rights were found to exist by the Civil Division of the Superior Court in the August 2011 judgment order referenced in note 3, above, but the Civil Division case has not yet been concluded. Accordingly, to comply with § 313(C)(3)(d), it is necessary for Applicants to add the location of the Smith spring rights to the appropriate existing conditions plan, together with any necessary note regarding the pendency of litigation over the Smith spring rights or easement.

Municipal Question 19

Section 313(C)(4) requires phasing if a project will take more than 24 months to complete. The evidence showed that the project is expected to take 9 to 14 months to complete, therefore § 313(C)(4) does not require phasing and is resolved in favor of Applicants.

10

Municipal Question 22

The 20-foot perimeter setback or buffer zone required by § 313(F)(2) is applicable only to Planned Unit Developments (PUDs), which have a mix of residential and commercial uses, not to entirely residential PRDs. Therefore Municipal Question 22 is inapplicable to this project and is resolved in favor of Applicants.

Competence and Responsibility to Carry Out Project – Municipal Questions 2, 20, & 21(d)

Section 313(A)(5) states that it is the responsibility of the developer of a PRD to install any necessary "community facilities" or infrastructure such as storm sewer lines and water and sanitary sewer lines. Section 313(C)(5) requires the application to contain evidence of Applicants' competence to carry out the project plan, and § 313(E)(2)(g) allows approval of the project to be conditioned on "performance guarantees assuring completion [or] compliance with the approved plan or conditions of approval."

Applicant Housing Vermont is an experienced developer of affordable housing projects in Vermont and has demonstrated in its application its competence to carry out this proposed project. It proposes to install all the necessary infrastructure for the project, including its water lines, sewer lines, stormwater system, roads, common areas, playground and lighting. No other sorts of community facilities, such as meeting halls or day care facilities, are proposed for the project, nor are they required by § 313(A)(5). Rather, that section simply requires that any community elements of the project necessary for it to function are the responsibility of the developer.

Appellants have not shown that any performance guarantees are required to assure compliance with the approved plan or any conditions of approval. The

11

application therefore meets §§ 313(A)(5) & (C)(5), and no additional performance guarantees are required under § 313(E)(2)(g).

Provision of Municipal Services – Municipal Question 30 (as to § 709(B)(7))

Section 709(B) of the standards for site plan approval requires the Court, in this de novo appeal, to review the application "taking into consideration" seven listed objectives, including subsection (7) "the provision of municipal services." The project is adequately served by municipal sewer and by a municipal or community water system. Only eight school-aged children are anticipated to reside at the development; the municipal school system is able to handle this number of children and, to the extent that this project succeeds in its intent of providing affordable housing to residents of Woodstock, such children would already have been attending Woodstock schools. Further, Applicants provided evidence that the municipal police and fire services are also able to provide adequate service to the project. As more fully discussed below with regard to access, fire trucks will be able to turn into the project driveway and be able to negotiate the turns in the project's loop roadway as necessary to provide fire protection. The proposed project therefore meets § 709(B)(7) of the standards for site plan approval.

Aesthetics & Design Issues, Including Density & Compatibility with Neighborhood – Act 250 Criterion 8; Municipal Questions 1, 10, 11, 12, 13, 16, 17(b)&(d), 30 (as to § 709(B)(3)&(4)) & 31 (as to § 710(A)(2), (8), (10), & (11))

Act 250 Criterion 8, as to aesthetics, requires simply that the project will not have an undue adverse effect on aesthetics. 10 V.S.A. § 6086(a)(8) (as to aesthetics). The so-called Quechee test, named for a 1985 decision of the former Environmental Board, In Re Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, Findings of Fact, Conclusions of Law, and Order, at 17–20 (Vt. Envtl. Bd. Nov 4, 1985), provides

12

the methodology for analyzing whether a project will have an undue adverse effect on aesthetics. As described by the Vermont Supreme Court in In re Times & Seasons, LLC, 2008 VT 7, ¶ 8, 183 Vt. 336, the Court must take the following two-pronged approach to determine if an application complies with Act 250 Criterion 8 as to aesthetics: first, to determine if the project will have an adverse aesthetic impact, and, if so, to determine whether the adverse impact would be undue. With respect to Criterion 8, the burden is on Appellants to show an unreasonable or adverse effect. 10 V.S.A. § 6088(b).

Section 313(A)(1) requires planned developments to be designed "to create a stable and desirable environment that is in harmony with the density and type of adjacent land uses." In addition to the other requirements for a planned development, §§ 313(A)(14)(b)–(e) require the Court to "consider" the relationship and compatibility of residential and non-residential uses, taking into consideration the location, arrangement, and size of lots, recreation areas, school sites, and open space; to consider the relationship of the proposed built development to the site's natural features; to consider the densities proposed for the entire area; and to consider any other considerations that will contribute to the orderly and harmonious development of the land.

For conditional use approval, § 710(A)(2) similarly requires that the proposed project not adversely affect "the character of the area affected." The statute authorizing municipal conditional use regulations makes clear that the character of the area is defined "by the purpose or purposes of the zoning district within which the project is located, and [by the] specifically stated policies and standards of the municipal plan." 24 V.S.A. § 4414(3)(A)(ii).

Section 313(B)(2)(b) recommends that buildings should be located in wooded areas or on field edges and not in sensitive areas such as wetlands, floodplains, or steep slopes. Section 313(B)(4)(b) and (d) allow the Court to require the

13

"preservation, planting, and maintenance of trees, ground cover, or other vegetation" to provide privacy screening, reduce noise and glare, or otherwise to soften or reduce the visual impacts of development, and to establish a barrier between incompatible land uses.

Section 709(B) of the standards for site plan approval requires the Court to review the application "taking into consideration" seven listed objectives, including subsections 3 and 4, relating to the adequacy of landscaping, screening, and setbacks "in regard to achieving maximum compatibility and protection of adjacent properties" and to the avoidance of glare. For conditional use approval, §§ 710(A)(8), (10), and (11) also require the project to meet the specific standards of the Zoning Regulations with respect to distances from adjacent or nearby uses, landscaping and fencing, and the design and location of structures and service areas.

Both the Aesthetics criterion of Act 250 and this group of municipal criteria address whether the project has been designed to fit well within its visual context or the character of the neighboring area, and whether it is compatible with and adequately protects neighboring properties such as those of the Appellants.

The neighborhood or visual context of the project is the hamlet or settlement of West Woodstock. It is located in the valley of the Ottauquechee River, along the Route 4 corridor. Most of the settlement is located close to and focused towards the valley floor and Route 4, surrounded by predominantly wooded hillsides and open fields, with views from the valley floor of the wooded hillsides and more distant wooded hills. A large middle and high school complex with a community indoor arena, and a cluster housing development of 33 units, are located southwesterly of the project property on either side of Route 4. The character of the area, as defined by the purpose of the zoning district, is an area compatible with medium density residential development; that is, one in which duplexes as well as single-family residences are permitted uses on a minimum of an 8,000 square foot lot, and in

14

which multi-family dwellings are conditional uses requiring a minimum of 16,000 square feet for a three-unit building. The character of the area therefore not only allows but promotes a density of development consistent with the design of this project.

In the area of the proposed project, the hamlet of West Woodstock contains a relatively dense group of residential or residential-style[7] buildings on small lots, 1½ to 2½ stories in size, diverse but traditional in design, with characteristic gabled roofs, porches, additions, and dormers. The proposed designs for the project buildings are compatible in size and style with the existing properties in the area. Although they are by definition all new, they have been designed with a diversity of building types, roof forms, and architectural details, to reflect and be compatible with the diverse elements of the neighboring vernacular architecture.

The project has been designed to cluster the new residential buildings on the flatter portion of the site, and to preserve the upland fields and forested areas as open space. The building locations therefore avoid steep slopes and wet areas. The new residential buildings surround a small common area and face an inner loop road, giving the project the appearance and functionality of a small neighborhood, consistent with the neighborhood along Route 4. The project has been redesigned so that the back yards of the new houses, and an area of community gardens, adjoin the back yards of Appellants' existing houses along Route 4, reinforcing the neighborhood design. No service area and no dumpster is now proposed; each building will be served by curbside garbage pick up.

The density of project buildings is consistent with the density of buildings in the existing neighborhood. From Route 4, the upland hillside of the site will

---

[7] Some of the older residential buildings are in commercial use or have been converted to apartments.

15

continue to be visible to the traveling public, while the new residential buildings will be partially blocked from visibility from the road by the existing houses along Route 4.

Minimal lighting is proposed for the project: bollard lighting for pedestrian use in the public areas, and downcast street lighting at the project's entrance and westerly parking lot. This lighting has been designed to avoid glare. The proposed fencing on the northerly and easterly sides of the Hirschbuhl property, together with the landscaping proposed for the project's streets and adjacent to the Barr and the David and Mary Roy back yards, is adequate to provide privacy screening and reduce noise and glare, with the exception of the landscaping proposed in back of the Roy back yard.

In this location, the easterly segment of the loop road is aligned with the driveways serving buildings 1D and 11C, which in turn are aligned with the David Roy house. No low fencing or dense shrubs are proposed at the head (southerly end) of those driveways to prevent the headlights of cars using those driveways from shining directly into the David and Mary Roy house and yard. In addition, the apparent alignment of the two arbor vitae (marked as "L") near their shed does not appear to provide as much protection from the headlights travelling southerly along the loop roadway as they would provide if offset from one another. Accordingly, to achieve the maximum compatibility and protection of adjacent properties and avoid glare, an additional condition is necessary requiring such fencing or shrubs at the head of the two driveways, and requiring the two arbor vitae to be offset or otherwise placed to achieve the maximum protection against headlight glare being visible from the David and Mary Roy house. With such an additional condition, the proposed project meets the requirements of §§ 313(A)(1), 313(A)(14)(b)–(e), 313(B)(2)(b), 313(B)(4)(b) and (d), 709(B), and 710(A)(2), (8), (10), and (11).

Applying the Quechee test for the purposes of the aesthetics component of

Act 250 Criterion 8, the Court must first determine:

> if the proposed project will have an adverse aesthetic impact, and, if so, [must consider] whether the adverse impact would be undue. An adverse impact is considered undue if *any one* of the three following questions is answered in the affirmative: (1) does the project violate a clear, written community standard intended to preserve the aesthetics . . . of the area; (2) does the project offend the sensibilities of the average person; and (3) has the applicant failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings.

Times & Seasons, 2008 VT 7, ¶ 8 (citations omitted).

From the point of view of the public, the aesthetic impact of this proposed project is not adverse. The design of the project preserves the upland fields and forested hillside of the site, which remain visible to the traveling public. To the extent that the public will see the project buildings and neighborhood, their design echoes the local vernacular architecture and should not be aesthetically displeasing, especially after the landscaping grows in.

However, recognizing that at least Appellants Hirschbuhl, Barr, and David and Mary Roy expect to experience an adverse aesthetic impact from the project, in that they would prefer to see and experience the playing field behind their houses rather than a whole new neighborhood, however well designed, the Court will proceed to the second prong of the Criterion 8 analysis.

First, Appellants have not shown that the project violates any clear written community standard intended to preserve the aesthetics of the area. Instead, to the extent that there are any written community standards regarding this area, they show an intent to concentrate residential development at a medium density such as this in the valley floor of this area, and to preserve the views of the wooded hillsides as this project does. Second, Appellants have not shown that this project offends the sensibilities of the average person. Finally, Applicants have taken generally

available reasonable mitigating steps to improve the harmony of the proposed project with its surroundings by designing the project to reflect the diversity of local vernacular architecture, by landscaping the site and limiting the built area of the project to the lower flat area and preserving the upland hillsides. Therefore, even if the effect of the project is considered to be adverse as it affects Appellants, they have not carried their burden under 10 V.S.A. § 6088(b) to show an undue adverse effect with respect to the aesthetics component of Act 250 Criterion 8.

Open Space & Natural Features, Legal Mechanism for Preservation

Open Space & Natural Features (other than streams and wetlands) – Municipal Questions 5, 6, 15, & 17(c)

Section 313(A)(9) requires a planned development to provide for preservation of open space, forested areas, significant views, steep slopes, wet areas, soils unsuitable for development, and other unique natural features, among other things. Section 313(A)(10) requires that, for a planned development less than 50 acres in size, at least 33% of the land be set aside as open space. The land set aside as open space is required to be of a size, type, and location to meet its intended use. § 313(A)(10)(a). In addition, § 313(A)(10)(b) recommends that it should be contiguous to other existing or potential open space areas, and § 313(B)(2)(a) recommends that the open space should preserve agricultural, recreational, or natural resources, and, where feasible, that it should serve to buffer adjoining land uses. Section 313(B)(4)(c) allows the Court to require the "preservation, planting, and maintenance of trees, ground cover, or other vegetation" in order to preserve "existing specimen trees, tree lines, critical wildlife habitat or wooded areas of particular natural or aesthetic value to the site."

Approximately half of the 8-acre project property has been set aside as open

18

space, in the upland portion of the property, meeting the requirements of § 313(A)(1). It meets its intended use for recreation and for the drainage swale to intercept stormwater from the western portion of the upland area of the site. it preserves almost all of the existing forested cover on the property. The project complies with the above municipal requirements as to open space.

Legal Protection Mechanism – Municipal Questions 4, 6(c), 7, & 8

For planned developments, § 313(A)(8) requires that the project plan shall be binding on the project property and on successive owners, and requires, if there are several owners, that an association be formed to assure adequate property management and compliance with the project's conditions of approval. It also provides for the Court to require that a Declaration of Covenants be filed.

With respect to open space, § 313(A)(12) requires that land reserved as private open space in a planned development be protected from future development and environmental damage through an "appropriate legal mechanism" approved in these proceedings. Section 313(A)(10)(c) recommends that the ownership of the open space is consistent with the best means of maintaining the resources on site. The legal mechanism required by § 313(A)(12) must restrict future building and removal of soil, trees and other natural features, except as is consistent with conservation, recreation or agricultural uses or with uses that are accessory to permitted uses. The legal mechanism must also provide that residents have access to the open space at all times, and must establish whether the open space is only for the benefit of the residents or may be open to other residents of Woodstock.

The "Grange Hill Common Interest Community Declaration" (the Declaration), in evidence as Applicants' Ex. A2, provides that the Declarant only reserves the development rights necessary to construct the project buildings and other features of the proposed project. No other development is provided for in the

19

Declaration. Article IV provides that the unit owners, and their tenants and invitees, have unrestricted access to all of the Common Elements of the project (other than the Limited Common Elements assigned to each unit), which includes access to the open space area. Article VIII provides for the maintenance of the Common Elements, including the Limited Common Elements, and the Declaration includes a mechanism for funding the expenses of that maintenance. The Declaration therefore complies with §§ 313(A)(8) and 313(A)(10)(c)

The Declaration contains § 3.22, which describes the land reserved as private open space outside of the red Development Area boundary as shown on Applicants' Ex. E and requires it to be maintained as open space within the meaning of §313(A)(9) of the Zoning Regulations. It provides that no structures shall be placed in the restricted open space area and provides that the area may be used for "recreation, gardening, harvesting hay, and cutting firewood, but may not be developed or otherwise used." It also requires the "unanimous consent of all of the Unit Owners, Mortgagees, and the [DRB]" to alter that section of the Declaration.

In order for Declaration § 3.22 to comply with § 313(A)(12), however, two of its elements must be amended. First, the project plan shows the forested areas of the open space area that are intended to remain forested. Allowing the unrestricted cutting of firewood in the common open space area is inconsistent with preserving the forested upland slopes that are approved in the project plans to remain forested.

Second, a future DRB cannot enter into a private agreement with the future unit owners and mortgagees to change the provisions of the Declaration as to the open space approved for the project. Instead, if the future unit owners and mortgagees wish to make such a change, they must submit it to the DRB for approval of an amendment under the Zoning Regulations in effect at such future time. With these amendments to Declaration § 3.22, the provisions of the Declaration will also comply with § 313(A)(12).

20

Parking

Section 313(B)(1)(b) requires that, in a planned development, areas for off-street parking must be provided that are adequate for the proposed occupancy, and at least equivalent to the requirements of § 520, which governs off-street parking. Section 520(A)(1) defines a parking space as being 9 feet by 18 feet in size.

Section 520(B) requires two off-street parking spaces per residential unit. Parking lots, contrasted with parking spaces, are required to provide a minimum of 250 square feet per car to allow for access to the spaces. § 520(A)(2).

Similarly § 709(B)(2) requires the Court to review the site plan application "taking into consideration" the objective of "the adequacy and safety of . . . parking facilities." For conditional use approval, § 710(A)(9) requires the project to meet the specific standards of the Zoning Regulations, that is, § 520, with respect to minimum off-street parking facilities.

Section 520(B) requires 72 off-street parking spaces for the 36 residential units. The project provides 80 spaces, which is more than sufficient to satisfy the regulations assuming that parking along the project's interior loop road qualifies as "off-street" parking.[8] However, 38 of those spaces are in driveways approximately 10 feet wide and 36 to 40 feet in length.

With respect to parking, Appellants argue only that the tandem driveway parking should not be counted as two parking spaces, as the car nearest the street must be moved in order for the other car to get out, and the spaces do not meet the minimum size under the definition of parking lot. However, nothing in § 520 or elsewhere in the Zoning Regulations precludes or prohibits tandem parking in a private driveway that is 10′ x 36′ in size or longer from being counted as two

___

[8] No party raised this issue and therefore the Court does not decide it.

21

parking spaces. Nor have Appellants shown that tandem parking will cause any problems, in a village context on a small private roadway, as long as both tandem spaces are assigned to a single residential unit.

Frontage, Access, Circulation, & Traffic

Frontage – Municipal Question 3

As the two tax parcels comprising the 8-acre parcel have merged, the property as a whole has more than the 50 feet of frontage required by § 305(D)(2) in the Residential Medium Density zoning district, as it has 70 feet of frontage near the Grange building, as well as 22.88 feet of frontage between the Hirschbuhl and the David and Mary Roy properties.

Access & Circulation – Municipal Questions 28, 29, 30 (as to § 709(B)(1)&(2)) & 31 (as to § 710(A)(13))

The issue of the adequacy of the access roadway onto the property is distinct from that of the frontage of the property. The strip of project property running between the Hirschbuhl and the David and Mary Roy properties tapers northwards from 22.88 feet in width at Route 4 to only approximately 17½ or 18 feet in width (by scale) at its northerly end. However, Applicants propose to use an additional adjacent 28-foot width of right-of-way[9] to obtain enough total width to install an access driveway for the project, a sidewalk from the project's sidewalk network to Route 4, and landscaping with street trees. The proposed access road meets the state highway B-71 standard at its outlet, and provides a 22-foot-wide roadway consisting of a two-lane, 18-foot-wide traveled way, with a two-foot-wide shoulder on each

---

[9] This right-of-way is also the subject of the private litigation between the parties. See note 3, above.

22

side. The internal loop roadway and its extension within the project, and the two parking lots, have been designed to allow the safe flow and maneuvering of the traffic generated by the project within the project property. Sidewalks line all the project roadways and provide access to the project's open space area in two locations: from the parking lot next to building 8D, and between the playground and building 6E.

Section 612(A) prohibits land development on lots without frontage, but allows the Planning Commission, and hence this Court, to approve access to a public road by a permanent easement or right-of-way at least 20 feet in width. In the present case, the project property technically has frontage. However, because the strip of property at the location of the access roadway itself is less than 20 feet in width at its inner end, and therefore the access roadway must utilize a right-of-way at least in part, the access roadway must be reviewed according to the standards of § 612(B). Under § 612(B), Appellants raise the issues of whether the access road is adequately designed for emergency vehicle access and whether it has adequate sight distances where it intersects Route 4.

Similarly, site plan approval of the project is required to take into consideration the objective of attaining "the maximum safety of vehicular and pedestrian circulation between the site and street network and adjacent traffic generators" and the objective of adequate and safe circulation facilities, that is, on-site circulation. § 709(B)(1)&(2). For conditional use approval, § 710(A)(13) requires that the project adequately meets the specific standards in the Zoning Regulations with respect to access and circulation.

The turning radii established in the B-71 standard are sufficient for fire trucks and delivery vehicles, as well as private automobiles, to turn safely into and out of the project driveway onto and from Route 4. The project's internal roadways have also been designed so that the largest emergency vehicles in use in Woodstock will

23

be able to negotiate the turns in the project and reach each of the buildings in the proposed development.

At the intersection with Route 4, the sight distance in both directions along Route 4 is greater than 400 feet. At the 35-mile-an-hour speed limit posted for that section of Route 4, the minimum stopping sight distance (required for a driver proceeding on Route 4 to see someone pulling out and be able to slow down and stop in time) is 250 feet, while the minimum corner sight distance (required for a driver stopped at the intersection to be able to pull out safely into the stream of traffic) is 390 feet. The location of the access roadway therefore meets the requirements for adequate sight distances in both directions.

A pedestrian crosswalk and warning signs are in place at the project access roadway, based on the use of the field as an athletic field. As an athletic field, the property generated approximately 2,620 pedestrian crossings of Route 4 annually. Pedestrian crossings by the approximately 4 or 5 middle- and high-school aged children from the project property are calculated to result in not more than half that number of pedestrian crossings at the crosswalk.

The on-site circulation of both vehicles and pedestrians is adequately provided for by the design of the project's streets and sidewalks. The fact that there are no sidewalks along Route 4 for the project's sidewalks to connect to is beyond the control of Applicants.

Accordingly, the project meets the requirements of §§ 612, 709(B)(1)&(2), and § 710(A)(13), with respect to access and circulation.


Traffic – Act 250 Criterion 5; Municipal Questions 3 & 31 (as to § 710(A)(3))

Act 250 Criterion 5 (10 V.S.A. § 6086(a)(5)) requires that the proposed project not cause unreasonable congestion or unsafe conditions with respect to the use of the highways (and other means of transportation). With respect to Criterion 5, the

24

burden is on Appellants to show an unreasonable or adverse effect. 10 V.S.A. § 6088(b).

For conditional use approval the project similarly must not adversely affect traffic on roads and highways in the vicinity. § 710(A)(3). To "assure that the community is not unduly affected," § 313(A)(6) allows the Court to subject the project to requirements regarding traffic.

Route 4 is a heavily traveled east-west road across Vermont, considered to be a major arterial road. In the vicinity of the project in West Woodstock, it carries an average daily traffic of 7,800 vehicles per day. An analysis of accident reports for this segment of Route 4 shows that such accidents were due to driver behavior or inattention, and not to any issues to do with the design of the roadway or its volume of traffic.

The entrance to the Woodstock middle school and high school complex, which also includes a community facility known as the Union Arena, is located about 550 feet farther to the west along Route 4 from the project access road, on the opposite side of Route 4. A left-turn lane 175 feet in length, capable of accommodating 7 cars, extends towards the east from the entrance to the school complex. Within the hamlet of West Woodstock, between the intersection at Prosper Road and the school/arena intersection, many individual driveways have direct access onto Route 4, and the speed limit is 35 miles per hour.

Using standard traffic engineering methods, the project is estimated to generate 23 vehicle trips (19 exiting and 4 entering) in the morning peak hour of traffic on the adjacent roadway, which is 7:30 to 8:30 a.m. at this location, and to generate 26 vehicle trips (17 entering and 9 exiting) in the afternoon peak hour, which is 4:30 to 5:30 p.m. at this location. These additional vehicle trips will not adversely affect traffic flow or safety on Route 4.

25

The Applicants' traffic engineer also analyzed the levels of service projected to be experienced at the project intersection and at the school/arena intersection for turns onto Route 4, and determined that both intersections will operate at levels of service A or B, which represent acceptable levels of little delay experienced by drivers waiting at those intersections to turn onto Route 4, depending on the direction of the turn.

However, Appellants report from their own observations that at times the traffic flow on Route 4 westbound backs up to near the project access roadway. Although this represents a queue of approximately 22 cars, for such a line of traffic to develop it is not necessary for all 22 cars to be turning into the school/arena entrance. Rather, it is only necessary for an eighth or ninth car to be waiting to turn into the school/arena entrance to exceed the left turn stacking lane length of seven cars, and therefore to impede any remaining cars from continuing westwards on Route 4. Such conditions may occur from time to time for an evening event at the arena, when many participants will seek to arrive at a given time, and may also occur from time to time in the morning arrival period when school is in session. However, such occasional queuing or backing up of traffic that already exists will not be affected or exacerbated by the traffic generated by the project.

The project therefore will not cause unreasonable congestion or unsafe conditions or adversely affect traffic on roads or highways in the vicinity, and therefore no requirements regarding traffic are necessary to assure that the community will not be unduly affected. Appellants have not carried their burden under 10 V.S.A. § 6088(b) to show an unreasonable or adverse effect with respect to Act 250 Criterion 5. The project meets Act 250 Criterion 5 and §§ 710(A)(3) and 313(A)(6) of the Zoning Regulations.

Act 250 Criterion 1(G) (10 V.S.A. § 6086(a)(1)(G)) provides that the applicant must demonstrate that the project will not violate the Vermont Wetland Rules. Act 250 Criterion 1(E) (10 V.S.A. § 6086(a)(1)(E)) provides that the applicant must demonstrate that development of lands "on or adjacent to the banks of a stream will, whenever feasible, maintain the natural condition of the stream, and will not endanger the health, safety or welfare of the public or of adjoining landowners."

Section 313(A)(9) requires planned developments to provide for the preservation of streams and stream banks, and of wet areas, among other things. Section 313(B)(2)(b) states that building locations should not include sensitive areas such as wetlands, floodplains, or steep slopes. Section 313(B)(4)(a) allows the Court to require the preservation or installation of trees or ground cover to provide an undisturbed vegetated buffer between developed and undeveloped portions of the site to protect water quality or other natural features, and requires a fifty-foot buffer from the mean water level of a stream and from "the delineated boundary of an identified wetland." Sections 403(A)(2), 403(D) and 523(A) similarly require a fifty-foot vegetated buffer, respectively, from "an identified or functionally significant wetland," from the top of the bank of a stream, and from a stream bank or from "the delineated boundary of an identified wetland." Section 403(A)(1) requires conditional use approval of any draining, filling, or alteration of lands identified as

---

[10] Municipal Question 27 relates to § 523(C), which is only applicable where mature forest cover exists along a stream, requiring it to be maintained along both sides of the stream and its adjacent wetlands. In the present case, the only applicable stream is Vondell Brook adjacent to the Fox parcel; in that location it has no mature riparian forest cover. Therefore § 523(C) is inapplicable.

wetlands on the Town's Critical Areas Analysis Map, and of hydric soils determined to be functionally significant under Vermont's Wetland Rules.

Two wet areas exist on the 8-acre project parcel; both were identified in the 2008 Decision. One wet area is located in the westerly portion of the upland area, below an old wellhouse, near the 775-foot elevation line and within the forested area. It will remain within the open space area and will not be disturbed by the project. Another frequently wet area is located near the middle of the easterly side of the property, northerly of building 4F. The project plans have been revised so that this wet area will also remain in the open space area and will not be disturbed by the project. Accordingly, the Plans provide for the preservation of the wet areas on the 8-acre project parcel, as required by § 313(A)(9).

The remaining provisions of the Zoning Regulations use the term "wetland" or "delineated" or "identified" wetland rather than "wet area." No wetlands appear on relevant federal, state or town wetland or critical area maps either on the 8-acre project property or on the Fox parcel. In order to be delineated as a wetland under the Vermont Wetland Rules, which refer to the U.S. Army Corps of Engineers manual, an area must demonstrate all three of the characteristics of hydric soils, wetland hydrology, and hydrophytic vegetation. The two "wet areas" on the 8-acre project property contain hydrophytic vegetation, but do not otherwise qualify for delineation as wetlands.

A small Class III wetland was delineated on the Fox parcel. As it does not appear on the Vermont Significant Wetlands Inventory map and is not contiguous to a Class II wetland, it is not subject to regulation under the Vermont Wetland Rules; therefore, the project does not violate the Vermont Wetland Rules and hence complies with Act 250 Criterion 1(G). 10 V.S.A. § 6086(a)(1)(G).

As well as not being regulated under the state wetland rules, the small wetland on the Fox parcel also is not functionally significant; that is, it provides

minimal wetland functions. The installation of the stormwater detention pond and its associated piping on the Fox parcel will temporarily affect 152 square feet of the wetland due to grading, and 2,460 square feet of the wetland due to the installation of the outlet piping through it. Although these impacts are smaller than that required to obtain a permit from the U.S. Army Corps of Engineers, Applicants obtained permit # NAE-2008-979, ruling that the activity will have "only minimal" environmental impacts, and approving those wetland impacts. Applicants' Ex. R1.

Regardless of the fact that it has been the practice of the DRB to interpret § 403(A)'s references to an "identified or functionally significant" wetland to mean only those wetlands identified on the Town's official maps, the wetland on the Fox parcel is neither identified on a map nor functionally significant, and therefore § 403(A) does not apply. However, as a practical matter, the whole project requires conditional use approval in these proceedings, including any aspects of the stormwater detention pond that affect the wetland or its buffer. Moreover, Applicants obtained Conservation Commission approval of the work, meeting the requirements of § 403(A).

Vondell Brook is a tributary of the Ottauquechee River that runs adjacent to a portion of the Fox parcel. In this area Vondell Brook is not in a natural state. From at least the school/arena driveway to below the Fox parcel, both banks of Vondell Brook have been raised by grassed berms.

The detention pond is located more than 50 feet from the top of the stream bank, and the area between is vegetated, providing a 50-foot vegetated buffer for the stream bank. Where it adjoins the Fox parcel, the banks of Vondell Brook have no mature riparian trees; the bermed banks are protected by grasses in that location. At the school/arena driveway, Vondell Brook runs in a 60"-diameter culvert; below the Fox property, near the property of Menotti, Vondell Brook runs in a constricting 24"-diameter culvert, which is meant to function in times of high flow or flooding in

29

Vondell Brook by backing up and diverting some of the flow southerly along a berm on the high school property directly towards the Ottauquechee River.

The stormwater detention system is designed to conduct the runoff from the Development Area of the 8-acre project parcel across Route 4 and into the detention pond. Stormwater from the northwesterly upland portion of the 8-acre project parcel, above the diversion ditch, is designed to run in a separate pipe across Route 4, bypassing the detention pond. The upland stormwater pipe and the outflow from the detention pond are connected below the detention pond, and flow together to Vondell Brook through a 24"-diameter pipe to be installed through the berm. The overflow system is designed with a headwall and stone reinforcing above and outside the ordinary high water mark, so that the stream bank will be protected from erosion both during normal operation and high water flow conditions.. Nothing about the development on or adjacent to the banks of the stream will endanger the health, safety or welfare of the public or of adjoining landowners. Accordingly, the stormwater system design on the Fox parcel meets the requirements of Act 250 Criterion 1(E) (10 V.S.A. § 6086(a)(1)(E)) and the municipal requirements as to protection of the stream and stream bank.

Existing Water Supplies - Act 250 Criterion 3

Act 250 Criterion 3 (10 V.S.A. § 6086(a)(3)) requires that the proposed project "not cause an unreasonable burden on an existing water supply, if one is to be utilized." The water supply for the project will be supplied by the Woodstock Aqueduct Company from an existing water main in the Route 4 right-of-way; it has allocated ample supplies to serve the project and Appellants do not challenge the adequacy of the water supply for the project.

However, the Woodstock Aqueduct Company also currently provides the water supplies for Appellants Burroughs and Appellants Richard and Roberta Roy

through existing water lines that cross the project property. Applicants propose to relocate both water lines due to the construction of the project, at Applicants' expense. Appellants challenge Applicants' rights to relocate the water lines, both in these proceedings and in the Civil Division of Superior Court. They presented evidence at trial in support of their arguments that the relocation will unreasonably burden Appellants Burroughs and Roy. In addition, by letter filed August 1, 2011, Appellants suggest that, if the decision of the Superior Court Civil Division as to the Smith spring rights becomes final, it should preclude this Court's approval of the application. However, this Court has already noted that any disputes among the parties regarding the parties' respective property rights, including Applicants' rights to relocate these water lines, must be resolved in the Civil Division of the Superior Court and are not before this Court.

The existing Roy water line is plastic and was therefore difficult to locate exactly. It runs generally westerly of the Grange building near the English property line and extends onto and across the English property to the Richard and Roberta Roy house. Applicants propose to provide Appellants Roy with a temporary water line during construction, and to provide them with a replacement new copper water line close to the current location of the existing water line. The replacement service will provide water at at least the existing level of pressure, quantity and quality.

The existing Burroughs water line is metal and has been located; it runs across the central area of the project property in approximately the locations of buildings 6E, 7F, and 10C. Rather than connecting to the project's water line, Appellants Burroughs prefer to have and to maintain a separate connection to the water main. Therefore, Applicants propose to run the new Burroughs water line along the perimeter of the project property from Route 4 down the access driveway right-of-way, along the landscaped area behind the David Roy and Barr properties, along the easterly side of the project property adjacent to the Vytra property, and

31

northerly along the perimeter of the Development Area to connect with the existing Burroughs water line. Applicants propose to install the new Burroughs water line at the outset of the project to keep any disruption in service to a minimum of only a few hours. The replacement service will provide water at at least the existing level of pressure, quantity and quality.

However, in order to ensure that both replacement water lines will be able to be maintained in the future, it will be necessary for the Declaration of Covenants or other permanent easement document to contain a provision precluding planting large species of trees or installing permanent structures over the location of each water line that would prevent the maintenance of those water lines in the future. This is especially important in relation to the Burroughs water line, as it passes behind buildings 4F and 5E whose units are anticipated to be sold, and as the water line appears to be located in a limited common area behind those buildings.

No evidence was provided that the Smith spring rights, see note 3 above, are utilized as an existing water supply; therefore, by its terms Act 250 Criterion 3 is inapplicable to the Smith spring rights.

Accordingly, as the replacement water service for both the Richard and Roberta Roy water supply and the Burroughs water supply will minimize disruption during the changeover, and will supply water from the same source at at least the same levels of quantity, quality, and pressure, the proposed project will not cause an unreasonable burden on an existing water supply, and therefore meets Act 250 Criterion 3.

Stormwater, Floodways, & Erosion

Act 250

Act 250 Criterion 1(B) (Waste Disposal related to Stormwater) (10 V.S.A. § 6086(a)(1)(B)), to the extent that Appellants claim it to be applicable to this project,

requires that the project comply with the ANR regulations and not involve the injection of waste materials or harmful or toxic substances into groundwater or wells.

Act 250 Criterion 1(D) (Floodways) (10 V.S.A. § 6086(a)(1)(D)) applies to the development of lands within a floodway or floodway fringe and requires that the development of such lands will not significantly increase the peak discharge of the stream and endanger the health, safety or welfare of the public or of adjoining landowners. None of the project parcels have been mapped or otherwise identified as being located within a floodway or a floodway fringe as those terms are defined in 10 V.S.A. §§ 6001(6) and (7).

Act 250 Criterion 4 (Erosion) (10 V.S.A. § 6086(a)(4)) requires that the project not cause unreasonable soil erosion or a reduction in the capacity of the land to hold water so that a dangerous or unhealthy condition may result.

Although the burden with respect to these criteria is on the applicant, 10 V.S.A. § 6088(a), 10 V.S.A. § 6086(d) and Act 250 Rule 19 provide that the relevant ANR permits create a rebuttable presumption that the application meets the respective Act 250 criterion and is not detrimental to the public health and welfare. In addition, the technical determinations of the ANR in such approvals or permits are to be accorded substantial deference by the District Commissions and hence by this Court in Act 250 proceedings. 10 V.S.A. § 8504(i).

In the present case, Applicants have obtained ANR Stormwater permits for the operation of the stormwater system for the project, and for the erosion prevention and sediment control necessary during construction of the project, giving them the benefit of the presumption as to these three Act 250 criteria. Appellants have failed to come forward with expert evidence to rebut the presumptions or to overcome the deference due to the technical determinations of the ANR permits. Accordingly, the proposed project meets Act 250 Criteria 1(B), 1(D), and 4.

An analysis of the adequacy of the stormwater system must nevertheless be made under the municipal criteria, which do not benefit from such a presumption.

Municipal Question 26

Section 523(B) requires that land uses and/or activities that "are designated" as potential water pollution hazards must be set back at least 150 feet from the stream. Leaving aside the question of who or by what standard what body is to do the designating, cf. In re Appeal of JAM Golf, LLC, 2008 VT 110, ¶ 17, 185 Vt. 201, the project involves no land use or activity within 150 feet of Vondell Brook except for the stormwater detention pond specifically allowed under the state stormwater permit; that pond has not been "designated" as a potential water pollution hazard and cannot reasonably be understood to be the type of hazard requiring such a setback.

Municipal Question 30 as to § 709(B)(5)

Section 709(B) of the standards for site plan approval requires the Court to review the application "taking into consideration" seven listed objectives, including subsection (5) "the adequacy of surface drainage facilities."

The undeveloped upland portion of the property consists of an easterly area, easterly of the drainage swale and northerly of the Development Area boundary, that will continue to drain generally easterly onto the Vytra parcel and towards Prosper Brook. Westerly and northerly of the drainage swale, drainage from the undeveloped upland portion of the property will be captured by the drainage swale and conducted to a piping system to the Fox parcel below the detention pond, where it will join the outflow from the detention pond and be discharged to Vondell Brook. Drainage from the Development Area will be collected through a storm drain system on the project property and be conducted by a piping system to the Fox

parcel, where it will flow over a grassy swale into the detention pond. The detention pond is sized and shaped adequately to handle the stormwater flow from the Development Area of the project. Both the grassy swale and the detention pond will provide treatment of the stormwater from the development area and will provide storage capacity and slower release during times of high stormwater flow. The system is designed to discharge through a pipe (under normal conditions) or over an overflow headwall (under high water conditions) into Vondell Brook at the Fox parcel.

Although the detention pond is designed to retain and release even the 100-year flood collected from the development area, the Court must assess whether the runoff from the upland area being diverted directly to Vondell Brook will cause any increased flooding in Vondell Brook, as that is water which, absent the project, would have reached the Ottauquechee by a different route. The state regulations require that the post-development runoff will be no greater than the pre-development runoff from a project property, but do not limit whether that runoff can be directed to a different location than in the pre-development condition.

The water to be discharged from both the Development Area and the westerly upland undeveloped area of the project represents only about 1.1% of the total drainage area of Vondell Brook. Under non-flood conditions, Vondell Brook can accept the additional water without any problem. Under flood conditions, and regardless of which computer modeling program is used, and whether the model accounts for ground infiltration or not, the additional water to be introduced to Vondell Brook from both elements of the project's stormwater system will have an insignificant or unmeasurable effect on the amount of water in Vondell Brook. In a storm event capable of causing the water level in Vondell Brook to rise by two feet, the additional discharge from the project's stormwater system would cause an additional rise in Vondell Brook of from 1/14 of an inch, under one hypothetical, to

35

about 5/8 of an inch, under another hypothetical. This rise in water level is insignificant in the sense that it would not contribute to any additional adverse effects during flooding conditions. That is, if there is serious flooding of Vondell Brook near the Menotti and Harriman properties, the discharge of stormwater from this project will not make it perceptibly worse than it would be without the project. The drainage facilities for the project therefore are adequate as required by § 709(B)(5).

Appellants presented ample evidence regarding the tendency of Vondell Brook to flood under spring thaw conditions when the ground is frozen. This tendency is exacerbated by the fact that Vondell Brook flows through a large 60″ culvert at the school/arena, past the Fox parcel, and then through an intentionally undersized 24″ culvert below the Fox parcel near the Menotti residence, before continuing on through a larger 50″ culvert farther downstream. The constricting culvert is designed so that when there is too large a volume of flow for the culvert to accommodate, the excess water will be diverted southerly directly towards the Ottauquechee River by a drainage swale and berm on the school/arena property. The school/arena diversion swale did not function as designed for a time when it was not being adequately mowed, but it has worked as designed since being adequately mowed. Applicants have entered into a drainage easement agreement with the high school for excess drainage from the project to flow to the Ottauquechee River by way of the school/arena drainage swale, and for the school/arena management to maintain the functionality of the swale by keeping it mowed. In order to ensure that the school/arena diversion swale and the 24″ culvert continue to function as designed to handle the stormwater discharge from the project, a condition must be imposed requiring Applicants to monitor their condition as necessary.

<u>Compliance with Town Plan – Municipal Question 9[11]</u>

Section 313(A)(14)(a) requires that the DRB, and hence this Court in this appeal, "consider" the objectives and policies set forth in the Town Plan when ruling on whether to approve a planned development. The Zoning Regulations do not otherwise make the provisions of the Town Plan mandatory. The applicable version of the Town Plan is the 2007 Comprehensive Plan.

The Town Plan emphasizes, with regard to housing, that "affordable housing for middle-income people is not available in Woodstock" and that the town "needs additional affordable housing units for its current residents and employees in order to maintain a broad social-economic base." Town Plan, at 59. The Town Plan urges the town to "strive to maintain the existing land use pattern of development" by encouraging residential development contiguous to existing development, by encouraging higher densities in the villages and hamlets, by allowing larger structures to be converted to multi-family use, and by preserving scenic vistas and open spaces on hills, among other things. <u>Id</u>.

The proposed project satisfies these elements of the Town Plan: it provides new affordable housing units contiguous to existing development and by conversion of an existing larger structure, while preserving open space on the hillside behind the project and avoiding construction on the steep slopes and in wet areas.

Appellants argue that the loss of the use of the field at the project property as

---

[11] This question only relates to the requirement for planned developments that the Court consider the objectives and policies of the Town Plan. Appellants did not qualify for party status in the Act 250 proceedings under Act 250 Criterion 10 (10 V.S.A. § 6086(a)(10)) regarding compliance of the project with the Town Plan, did not appeal that party status determination, and therefore do not contest the District Commission's determination that the project complies with the Town Plan under Act 250 Criterion 10.

a playing field for the high school and middle school is contrary to Objective 4.1.1 of the Town Plan, at 39, which recognizes that the town has an inadequate number of recreational fields for athletic use and encourages the provision of an adequate number of recreational fields and play areas in the Town. However, nothing in the Town Plan suggests that playing fields should take precedence over affordable housing. Nor does anything in the Zoning Regulations allow the Town to compel the private owners of a field, who have volunteered the use of the field as a playing field in the past, to keep their property limited to that volunteered use.

Appellants argue that the project will destroy the views, vistas, open space, green space, and woodlands of the project property, contrary to the Historic Preservation and Open Space elements of the Town Plan, will destroy the historic significance of a nearby twin-cupola barn visible from the project property, and will destroy the historic character of the hamlet of West Woodstock. As discussed above, the project complies with the open space requirements of the Zoning Regulations and thereby also complies with the Town Plan, by preserving the upland half of the project property in its open condition of fields and forest cover. The project will not alter the historic significance of the barn on the neighboring Vytra property—it remains in place and capable of being visited or viewed. Nor will the project harm the historic character of the hamlet of West Woodstock; it simply adds well-designed, compatible new housing to the existing historic housing and other features.

The Court has fully considered the objectives and policies set forth in the Town Plan and concludes that, on balance, the proposed PRD should be approved in view of those objectives and policies.

<u>Whether project should be conditioned – Municipal Questions 21(a)–(c) & 32</u>

Section 313(E)(2) allows the Court to impose conditions for, among other things, visual and acoustical screening, a schedule of construction, and the protection of natural and/or historical resources, as well as to impose conditions related to the developer's ability to carry out the proposed project already addressed above regarding § 313(E)(2)(d). In addition, in conducting conditional use approval, § 710(C) allows the Court to impose reasonable conditions and safeguards necessary to carry out the statute and regulations. As discussed more fully above with respect to each necessary additional condition, in this decision the Court has imposed five additional conditions beyond those imposed by the DRB or the District 3 Environmental Commission. They are restated below for ease of reference.

Accordingly, based on the foregoing, it is hereby ORDERED and ADJUDGED in the municipal appeal, Docket No. 203-10-09 Vtec, that planned residential approval, site plan approval, and conditional use approval is GRANTED to Appellee-Applicants' application for the Grange Hill project, with the conditions as imposed by the DRB and the additional conditions as stated in this decision. It is hereby ORDERED and ADJUDGED in the Act 250 appeal, Docket No. 15-1-10 Vtec. that approval is GRANTED to Appellee-Applicants' application for the Grange Hill project, with the conditions as imposed by the District 3 Environmental Commission and the additional conditions as stated in this decision; the District 3 Environmental Commission shall perform the ministerial task of producing a revised Act 250 Land Use Permit reflecting the additional conditions.

The following additional conditions are imposed by this decision:
1) As to the Smith spring rights found to exist by the Civil Division of the Superior Court as referenced in note 3, above, Appellee-Applicants shall note the location of the spring rights on the appropriate existing

39

conditions plan; they may note the pendency of the Civil Division litigation or any pending appeals, as appropriate.

2) Applicants shall install additional fencing or shrubs at the head of the two driveways serving buildings 1D and 11C, and shall offset or otherwise place the two arbor vitae to be planted near the Roy shed, so as to achieve the maximum protection against headlight glare being visible from the David and Mary Roy house.

3) A provision shall be added to the Declaration of Covenants precluding planting trees or installing structures within the path to be taken by each water line that would prevent the maintenance of those water lines in the future.

4) Section 3.22 of the Declaration of Covenants shall be amended to delete the reference to the cutting of firewood and instead to provide that the forested areas of the open space area shall remain forested, subject only to professional forest management practices. Further, that section shall be amended to state that if the future unit owners and mortgagees agree among themselves to make a change to that section, they must then submit it to the DRB for approval of an amendment under the Zoning Regulations in effect at such future time.

5) Applicants shall monitor the mowed condition of the school/arena diversion swale, and the condition of the 24" culvert that diverts water to that swale, as necessary to determine that they will continue to function as designed.

Done at Berlin, Vermont, this 14th day of October, 2011.

_____
Merideth Wright
Environmental Judge